OPINION
{¶ 1} On March 15, 2001, Chad A. McKinley was indicted by a Franklin County grand jury on 28 counts related to alleged sexual misconduct involving children. Specifically, the charges were: three counts of rape, first-degree felonies; two counts of pandering obscenity involving a minor, second-degree felonies; 13 counts of pandering obscenity involving a minor as felonies of the fourth degree; five counts of pandering sexually-oriented matter involving a minor, second-degree felonies; four counts of illegal use of a minor in nudity-oriented material or performance, fifth-degree felonies; and, one count of illegal use of a minor in nudity-oriented material or performance as a second-degree felony. The incidents giving rise to the charges are discussed below.
{¶ 2} Mr. McKinley's jury trial commenced on February 25, 2002, and the jury returned its verdicts on March 1, 2002. With regard to the most serious of the charges, the jury convicted Mr. McKinley of one count of rape and one count of the lesser-included offense of gross sexual imposition. The jury acquitted him of the remaining rape count. The jury returned guilty verdicts as to the remaining 25 counts relating to numerous photographs.
{¶ 3} The trial court conducted a sex offender classification and sentencing hearing on March 8, 2002. The parties first stipulated that Mr. McKinley should be classified as a sexual predator. The trial court then, after merging several counts with others for purposes of sentencing, ordered the following terms of imprisonment: 10 years for rape; 5 years for gross sexual imposition; 8 years for one of the counts of pandering sexually-oriented matter involving a minor; 5 years for each of the four other counts of pandering sexually-oriented matter involving a minor; 5 years for one count of illegal use of a minor in nudity-oriented material or performance; 5 years for one of the counts of pandering obscenity involving a minor; and, finally, 17-month terms for each of the twelve remaining counts of pandering obscenity involving a minor. Each prison term was ordered to be served consecutively, and the aggregate sentence totals 70 years. In addition to ordering all prison terms to be served consecutively to one another, the court's sentencing entry indicates that the sentence imposed in the instant case would be served consecutively to Mr. McKinley's "present sentence." The record reveals that at the time of sentencing, he was then completing a three-year prison term resulting from an unrelated attempted burglary plea/conviction.
{¶ 4} Mr. McKinley (hereinafter "appellant") has timely appealed his conviction and sentence, assigning two errors for our consideration:
{¶ 5} "ASSIGNMENT OF ERROR I
{¶ 6} "Appellant's trial counsel's performance fell to the level of ineffective assistance of counsel.
{¶ 7} "ASSIGNMENT OF ERROR II
{¶ 8} "The court erred in its sentencing and committed plain error in that it failed to apply the doctrine of merger for Counts I and II."
{¶ 9} Both assignments of error require a review of the evidence adduced at trial.
{¶ 10} Appellant, who was 50 years old at the time of trial, had been a long-time friend of Dean E.[1], the father of the primary victim in this case, Steven E.[2] At the time of trial, Steven was 14 years old. Steven testified at length about being sodomized by appellant when he was 11 years old. Steven identified Polaroid photographs which, according to his testimony, depict appellant in the act of sodomizing him and also assaulting him anally with a "vibrator." Steven also identified other Polaroid photographs of him nude, which had been taken by appellant.
{¶ 11} Steven testified that these events took place when he spent time with appellant at the Columbus home of appellant's parents, Annabelle and Harold McKinley. Appellant lived there with his elderly parents at the time, while Steven and his family lived in Mansfield, Ohio. According to Steven, his father left him in the care of his friend, appellant, in Columbus on several occasions for up to one week at a time during Steven's summer break from school. It was on those occasions that appellant sodomized him, took nude photographs of him, and showed him photographs and magazines depicting children engaged in sexual activity. Appellant also directed Steven to photograph his younger sister, Lea E., nude. Steven identified a headboard and bedspread appearing in numerous photographs as belonging to appellant.
{¶ 12} Victoria Blythe testified regarding her discovery of numerous photographs in the home of her long-time friends, Annabelle and Harold McKinley. Ms. Blythe stayed with them when Harold became ill and Annabelle needed help in "late October, early November" 2000. When Blythe moved in with them, she stayed in the bedroom of appellant, who was temporarily "away" at the time.[3] Blythe stayed for about one month, until appellant's aunt arrived to help Mrs. McKinley following her husband's death.
{¶ 13} After Harold McKinley's death in early December 2000, Ms. Blythe decided to help by cleaning the house for Mrs. McKinley before guests arrived for the funeral. Blythe planned to leave soon because Mrs. McKinley's sister would be arriving from out of town. While thoroughly cleaning appellant's bedroom for its next guest, Blythe discovered the photographs at issue in the drawers atop an old dresser. According to Blythe, as she cleaned the dresser, she was "pushing pretty hard and [her] hand slipped and the drawer went flying and it opened up." When she gathered the items that had scattered, she found Polaroid photographs "of Steven laying there on a bed naked." Blythe was acquainted with Steven, his father, and his sister from their overlapping visits to the McKinley residence on earlier occasions before Blythe stayed at the home. Steven and his family had visited when appellant was home.
{¶ 14} Ms. Blythe identified certain state's exhibits as photocopies of the Polaroid photos she discovered that day. Other exhibits she could not positively attest to having seen personally that day because "[t]here was so many, * * * so much of it there." She, like Steven, also identified the bed's headboard and the bedspread appearing in some of the photographs as those which were in appellant's room when she arrived to stay temporarily. Blythe clarified that she had "no idea" when this bedroom and, in particular, the dresser had last been cleaned.
{¶ 15} Ms. Blythe did not go to the police immediately but, out of respect for Mrs. McKinley, Blythe waited until just after Harold McKinley's funeral. She then went to the police to report her discovery of the photographs.
{¶ 16} On cross-examination, Ms. Blythe testified that if appellant maintained a residence separate from his parents', she was not aware of it. She added that appellant had not, to her knowledge, ever done so, "not the whole time [she] knew him," which was about ten years.
{¶ 17} Upon further cross-examination, Ms. Blythe conceded that during her month-long stay preceding her discovery of the photographs, she had not seen appellant in his room and that she had slept in his bedroom every night of that month. She also conceded that during that month, she was out of the McKinley home frequently to run errands and so forth.
{¶ 18} Defense counsel asked Ms. Blythe whether she ever noticed "any marijuana seeds and stems" on some type of "tray" that might have been in appellant's bedroom. She responded that she "wasn't sure what they were" and noted that she first noticed something like that when she was conducting her thorough cleaning of appellant's room before she left. She continued to maintain that she did not know what the substance or substances were notwithstanding defense counsel's plain reminder to the jury of her age of 41.
{¶ 19} Cross-examination then proceeded to the issue of Ms. Blythe's implicit failure to "mention to Annabelle or her sister" what Blythe had found in appellant's bedroom. Blythe again stated that she did not "mention" it immediately, followed by: "[A]t that tense time I could not find the right words to tell her what I had found out about her son, considering that her husband had just died. I didn't have the words to do that." Although Blythe's direct examination did not reveal precisely how "immediate" Blythe's report to the police was made, defense counsel clarified this fact on cross-examination. Knowing that "Annabelle had someone there with her," Blythe went to the police station soon after the burial on the day of the funeral. As revealed on cross-examination, Harold McKinley died on December 2, 2000, and the police executed a search warrant at the McKinley residence on December 8, 2000.
{¶ 20} On redirect examination, Ms. Blythe explained that she did not go to the police station before the funeral out of respect and affection for Annabelle McKinley. Blythe added that she nonetheless jeopardized their friendship because she would "want somebody to do something if they found something like that about" her three children. Defense counsel declined any recross-examination.
{¶ 21} The state's next witness, Lieutenant Robert I. Pendleton, was a 26-year veteran of the Perry Township Police Department. Victoria Blythe had delivered the photographs to the police station. A search warrant was obtained and was executed on the house in question on December 7, 2000. No one was at the residence at the time, so Lieutenant Pendleton decided to go back the next day. Lieutenant Pendleton did go back the next day, and Mrs. McKinley let him in the house. Lieutenant Pendleton testified that his was a "small police department," that he personally knew the McKinleys, including appellant, and that he had always known appellant to have lived at that address.
{¶ 22} This search warrant, along with a second executed later, recovered a headboard to a bed which was the same headboard depicted in certain photographs. In addition, undeveloped film was seized. The photographs produced from this film included pictures of two children, nude, in a bathtub. Also taken from the home, specifically, from appellant's bedroom and an adjacent spare bedroom, were miscellaneous photographs of nude and/or partially-exposed minors engaged in various sexual activities and/or urinating. These photographs included titles such as "NYMPH LOVER," "NYMPH LOVER No. 2," and "EXOTIC SEX GAMES."
{¶ 23} By his first assignment of error, appellant contends that he was deprived the effective assistance of trial counsel.
{¶ 24} The well-established standard by which we are bound in reviewing a claim of ineffective assistance of counsel is set forth in Strickland v. Washington (1984), 466 U.S. 668; accord State v. Bradley (1989), 42 Ohio St.3d 136, cert. denied (1990), 497 U.S. 1011. In order to prevail on a claim of ineffective assistance of counsel, appellant must satisfy a stringent two-prong test. First, appellant must demonstrate that counsel's performance was deficient. To meet that requirement, appellant must show that counsel's purported error was such that counsel was not functioning as the "counsel" guaranteed by theSixth Amendment to the United States Constitution. Appellant may prove that counsel's conduct was "deficient" by identifying acts and/or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all of the circumstances, the alleged acts and/or omissions were outside the wide range of professionally "competent" assistance. Strickland, supra at 690.
{¶ 25} If appellant successfully proves that counsel's assistance was "deficient," the second prong of the Strickland test requires appellant to demonstrate resulting prejudice. To satisfy that requirement, appellant must show that counsel's errors were so deficient as to deprive him of a fair trial, a trial with a "reliable" result. Id. at 687, 692. Appellant would meet this standard by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
{¶ 26} Applying the Strickland test to the instant case, we first examine the record to ascertain whether appellant's trial counsel's performance was deficient. First, appellant claims that his trial counsel was deficient because he failed to object to "improper remarks" and argument(s) made by the state during opening statements. Specifically, appellant points to the following statement of the prosecutor:
{¶ 27} "When I think about this, I think what do you say when a childhood should have lots of happy memories, a childhood should have fun, a childhood should be somewhat carefree. Every parent wants their children to grow up happy, well adjusted, and be able to deal with things that happen to them in their life.
{¶ 28} "* * *
{¶ 29} "Childhood should not be fraught with memories of being exploited by an adult, a friend of the family, someone that your parents trusted, someone that you visited with, someone who then took your childhood away from you and exploited you and used you, essentially, and subjected you to photographs, nudity. These things mold a person.
{¶ 30} "* * *
{¶ 31} "When your childhood has been corrupted and corroded and tainted and becomes a trauma to you, that's going to be with you for the rest of your life. This is what's happened." (Tr., Vol. I at 17-19).
{¶ 32} The prosecutor then went on to summarize the evidence, which appellant has not asserted was improper. Appellant argues that the statements above "set up the jury to hear the evidence in an impassioned, sympathetic light" and that his trial counsel should have objected to such statements. We do not agree that the failure to object to the above statements rose to the level of deficiency as set forth in Strickland. Objections tend to disrupt the flow of trial and are considered technical and bothersome. See State v. Davie (1997),80 Ohio St.3d 311, 331. Further, appellant's counsel's failure to object at that time certainly can be viewed as a tactical decision well within the realm of reasonable professional judgment.
{¶ 33} Next, appellant asserts his trial counsel was deficient in making the following statement during his opening remarks:
{¶ 34} "I ask you again as I did earlier, and I simply do this to remind you, please do not let Mr. McKinley's jail clothing affect your decision. Please bear in mind it is not our responsibility to prove the case. We are simply executing our right to have the case proved beyond a reasonable doubt, which it is, will be the opinion at the end of this case, I believe, unless something is worked out differently in the meantime, but I believe at the conclusion of this case we do not believe there will be sufficient evidence for a conviction." (Emphasis added; Tr., Vol. I at 34-35.)
{¶ 35} Appellant asserts that the statement emphasized above alluded to plea bargaining and/or compromise and sent the message that if appellant could "negotiate a way out this," he would because he is guilty. We do not agree that this statement was in reference to a possible plea bargaining situation. Even if that was indeed defense counsel's intent, one cannot say that the jury understood it to be so. The statement was made in the context of the state's burden of proof and defense counsel's assertion that the state would not be able to prove its case. Just prior to this statement, defense counsel had stated that, "when my client was confronted with these allegations, * * * he entered a plea of not guilty and said that he didn't do it." Id. at 33.
{¶ 36} Even if such statement could be considered ill-advised, appellant simply cannot show that such isolated statement prejudiced the outcome of this case. There was overwhelming evidence of guilt here, and appellant has not demonstrated that even if this amounted to deficiency under the Strickland test, but for the statement, the result of the trial would have been otherwise.
{¶ 37} Appellant further asserts that his trial counsel was deficient in failing to object to leading questions. Again, the decision not to object is a tactical decision, and certainly in the case at bar — which involved the testimony of a 14-year old boy defense counsel could reasonably chose not to object to a certain line of questioning by the prosecution for tactical reasons. Further, the evidence as a whole, even barring the testimony elicited by what might be considered leading questions, would support the verdict here. Therefore, appellant cannot demonstrate prejudice.
{¶ 38} Appellant next asserts his trial counsel was deficient in his handling of the Crim.R. 29 motion for acquittal. Specifically, appellant asserts that his trial counsel should have included in such motion the issue of where appellant had resided (he was, for most of the time, in jail on an unrelated charge) during the period of time in Counts No. 17 through 28 (October 1, 2000 through December 15, 2000) in the indictment and the issue of whether appellant had dominion or control over the guest bedroom in his parents' home.
{¶ 39} As a general matter, the failure of trial counsel to make a Crim.R. 29 motion does not constitute ineffective assistance of counsel when the state's case-in-chief links the defendant to the crimes of which he or she is accused. State v. Small (May 1, 2001), Franklin App. No. 00AP-1149. Hence, if the state's case-in-chief links the defendant to the crimes of which he or she is accused, ineffective assistance of counsel is not shown where defense counsel fails to fully argue a Crim.R. 29 motion for acquittal. See State v. Antrum (Dec. 4, 2001), Franklin App. No. 01AP-446. In the case at bar, the state's case-in-chief did link appellant to the crimes he had been charged with and, therefore, ineffective assistance of counsel has not been shown in relation to the Crim.R. 29 motion.
{¶ 40} Finally, appellant asserts ineffective assistance of counsel for trial counsel's failure to raise the doctrine of merger at the sentencing hearing. However, given our disposition of the second assignment of error, appellant cannot show prejudice and, therefore, his claim of ineffective assistance of counsel as to this issue fails.
{¶ 41} In summary, appellant has, at the very least, failed to show any prejudice arising from any claimed deficiency of his trial counsel. Therefore, appellant has failed to show ineffective assistance of counsel. Accordingly, appellant's first assignment of error is overruled.
{¶ 42} By his second assignment of error, appellant contends that the trial court erred in sentencing appellant on both the rape conviction (Count No. 1) and the gross sexual imposition ("GSI") conviction (Count No. 3). The state concedes error in that appellant's convictions for rape and GSI arose from evidence revealing a single course of conduct and that, therefore, the two counts should have been merged for sentencing. We agree. Therefore, this case must be remanded for the sole purpose of conducting a new sentencing hearing.
{¶ 43} Accordingly, the second assignment of error is sustained.
{¶ 44} In summary, the first assignment of error is overruled, and the second assignment of error is sustained. This judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part as to sentencing, and this cause is remanded to the trial court with instructions to conduct a new sentencing hearing in accordance with this opinion.
Judgment affirmed in part and reversed in part; and cause remanded with instructions.
KLATT and BOWMAN, JJ., concur.
[1] We deem it appropriate to afford some measure of privacy to the primary prosecuting witness in this case, a 14-year-old boy. To that end, we omit references to the family's last name.
[2] Steven is the "primary victim" in this case insofar as he is the subject of the rape, the most serious individual conviction entered here, in addition to being photographed and being directed to photograph arguably obscene and/or sexually-oriented matters. Steven was not the only "victim" in this case; however, he was the only one to testify.
[3] As alluded to infra, appellant was "away" serving a prison sentence.